Filed 9/14/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| DENNIS C. BRUE, as Special Administrator, etc., <br><br>     Plaintiffs and Appellants, <br><br> v. <br><br> AL SHABAAB, <br><br>     Defendant and Respondent. | B294814 <br><br> (Los Angeles County <br> Super. Ct. No. BC615963) |

    APPEAL from a judgment of the Superior Court of Los Angeles County, Terry A. Green, Judge.  Affirmed.

    Haysbert Moultrie and Nazareth M. Haysbert for Plaintiffs and Appellants.

    No appearance by Defendant and Respondent.

————————————

Dennis C. Brue as administrator of the estate of Angela Nyokabi Githakwa, Raphael Githakwa Kimata, Regina Nyambura Githakwa, Caroline Njeri Githakwa and Samuel Kimata Githakwa (collectively Githakwa parties), individually and on behalf of all others similarly situated, appeal the order denying their request for entry of a default judgment and dismissing their wrongful death action against the terrorist organization Al Shabaab, contending the trial court erred in determining sua sponte it lacked personal jurisdiction over Al Shabaab and dismissing the lawsuit without first holding a hearing on that issue. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Githakwa Parties' Initial Complaint and Request for Entry of a Default Judgment*

Over the course of 15 hours on April 2, 2015, militants affiliated with Al Shabaab,[1] a terrorist organization with roots in Somalia, murdered 148 students in their dormitories at Garissa University in Kenya, including 21-year-old Angela Nyokabi Githakwa. Angela's four surviving parents and siblings, all residents and citizens of Kenya, as was Angela, along with the special administrator of her estate in California,[2] sued Al Shabaab and 20 unnamed defendants seeking more than $100 million in emotional, psychological and economic damages resulting from her death.

---

[1]    Al Shabaab means "the youth" in Arabic.

[2]    The operative second amended complaint explained Brue, a California lawyer, was appointed as special administrator for the purpose of pursuing claims against Al Shabaab under California and Kenyan law.

In their original complaint filed April 4, 2016, the Githakwa parties alleged a state law cause of action for wrongful death on behalf of Angela's family members, a survival claim on behalf of her estate and a cause of action for intentional infliction of emotional distress on behalf of all of them. The complaint also asserted multiple federal causes of action against Al Shabaab for extrajudicial killing in the course of war crimes, crimes against humanity and civil violations of the Racketeer Influenced and Corrupt Organizations Act (RICO).

Between July and August 2016 the Githakwa parties served Al Shabaab by mailing or personally serving four Al Shabaab members incarcerated in federal prison in California, Illinois, Kansas and Louisiana. On August 5, 2016 the Githakwa parties moved for an order deeming service effective under Corporations Code section 18220 and Code of Civil Procedure section 416.40, subdivision (c). The trial court granted their motion on October 4, 2016. After Al Shabaab failed to respond to the complaint, the Githakwa parties on January 17, 2017 requested entry of default. The clerk entered the default the same day.

On April 4, 2017 the Githakwa parties filed an application for default judgment supported by multiple declarations. On June 14, 2017 the trial court dismissed with prejudice all federal claims alleged in the complaint[3] and dismissed without prejudice the Githakwa parties' three state causes of action, granting them leave to allege additional facts, including those absent from their

---

[3] The court ruled state courts lack jurisdiction over claims brought under the law of nations and the Githakwa parties had failed to allege an "identifiable injury to the domestic commerce of the United States" as required for their RICO claims.

3

original pleading but presented by declaration with their application for default judgment, to support personal jurisdiction over Al Shabaab. However, the court cautioned, even with additional facts pleaded with particularity, it was unclear whether they "would be sufficient to show that Defendant has purposefully availed itself under California law."

2. *The Githakwa Parties' Operative Second Amended Complaint and Request for Default Judgment*

The Githakwa parties filed a first amended complaint on September 5, 2017 and the operative seconded amended complaint on October 6, 2017 as a putative class action on behalf of themselves and all others similarly situated, alleging the three state law causes of action that had been dismissed without prejudice. Unlike the original complaint, which had alleged both general and specific personal jurisdiction over Al Shabaab, the second amended complaint asserted only that the court had general personal jurisdiction over Al Shabaab.

In 42 paragraphs over eight pages the Githakwa parties attempted to allege facts demonstrating Al Shabaab's "systematic and continuous terrorist activities in and through California." They alleged Al Shabaab had sent agents to live in California, attempted to recruit and radicalize California residents and to communicate with those already radicalized, and received financial support from individuals living in California. Specifically, the Githakwa parties asserted that residents of California and the United States (without distinguishing between the two) donated approximately $70-$100 million annually to Al Shabaab. They further alleged that Basaaly Moalin, a man who lived in San Diego, was "one of the significant individual monetary contributors to Al Shabaab." Moalin, they averred, had

been arrested in San Diego in late October 2010 based on 1,800 intercepted phone calls from or to San Diego. Among these calls were conversations between Moalin and Al Shabaab leaders.

In total, the Githakwa parties' pleading implicated six Southern California residents by name as Al Shabaab affiliates: Moalin; Moalin's accomplice Issa Doreh, who had also been arrested in San Diego the day after Moalin's arrest; another San Diego man, Mohamed Khadar, who was arrested and convicted for "using his influence to solicit funds from others"; a fourth San Diego resident, Jehad Serwan Mostafa, indicted for joining Al Shabaab and conspiring to provide material support to the organization; a San Diego woman, Nima Ali Yusuf, who admitted to providing support to Al Shabaab through funding and personnel; and an Anaheim resident, Ahmed Nasir Taalil Mohamud, who was "convicted in 2013 of providing material support to Al Shabaab and money laundering."

Further, the Githakwa parties suggested California residents had been targets of Al Shabaab intimidation: Multiple individuals with connections to Al Shabaab had threatened Los Angeles residents Trey Parker and Matt Stone, the creators of the television show *South Park*. In addition, in a February 2015 video Al Shabaab had threatened to attack shopping malls in the United States, including "Jewish-owned shopping malls in California." The videos' purported purpose was to inspire lone wolf attacks by radicalized individuals in the United States and California.

Finally, the Githakwa parties alleged California residents had been victims of Al Shabaab attacks: A San Diego-based nonprofit's volunteer was killed in an Al Shabaab suicide bombing, and a former San Diego high school student was

wounded during an attack on a mall in Kenya. The Githakwa parties also described the December 2, 2015 terrorist attack at the Inland Regional Center in San Bernardino, which had killed 14 people and wounded 22 others. They alleged evidence suggesting Syed Rizwan Farook, one of the two perpetrators, had contact with Al Shabaab prior to the attack.

During October 2017 the Githakwa parties served the four imprisoned Al Shabaab members with the second amended complaint in the same manner the trial court had found effective for the initial complaint. The Githakwa parties filed proofs of service with the trial court on November 2, 2017. Again, Al Shabaab did not respond to the second amended complaint or to the statement of damages served on May 10, 2018. On June 27, 2018, at the Githakwa parties' request, the clerk entered Al Shabaab's default.

On August 31, 2018 the Githakwa parties submitted their application for entry of a default judgment against Al Shabaab. With their application the Githakwa parties included declarations by two expert witnesses on terrorism and counterterrorism, Evan Kohlmann and Kaj Larsen. Kohlmann's declaration stated that many of Al Shabaab's foreign fighters from the United States and some of its American financial support came from San Diego. Larsen's declaration detailed FBI disruption of domestic terror plans by "homegrown" jihadis from Somali-American communities in San Diego. He described the Somali-American communities in San Diego, and in California generally, as the origin of a portion of Al Shabaab's funding. Larsen also suggested, should the court be permitted to view classified information, it would strengthen and confirm his conclusions. The Githakwa parties also included a legal

memorandum describing the procedural history of the case, restating the ties between Al Shabaab and California and detailing their damage claims.

3. *The Court's Dismissal of the Case*

On November 9, 2018 the trial court denied the Githakwa parties' request for entry of a default judgment, ruling the court lacked personal jurisdiction over Al Shabaab. In its order dismissing the action, the court explained fundraising alone was insufficient to confer general jurisdiction over an organization. Further, the court ruled, jurisdiction over individual criminal defendants affiliated with Al Shabaab did not create jurisdiction over the organization as a whole. Finally, although the Githakwa parties had only alleged the court's general jurisdiction over Al Shabaab, the court ruled it could not assert specific jurisdiction over Al Shabaab arising out of the Garissa University attack. The court explained, "There is no 'black hat' exception in our law of civil jurisdiction which permits the court to sanction the wicked, no matter how weak the punishment appears next to the crime or how richly their victims deserve what comfort and closure a recovery can bring."

The Githakwa parties filed a timely notice of appeal.

## DISCUSSION

1. *The Trial Court Did Not Violate the Githakwa Parties' Due Process Rights by Determining It Lacked Jurisdiction over Al Shabaab*

   a. *A court may determine its jurisdiction before entering a default judgment*

Because Al Shabaab failed to appear, the Githakwa parties argue, it forfeited its right to challenge the trial court's exercise of jurisdiction over it and the court erred in evaluating that issue on

7

its own.  The first aspect of this two-pronged argument is fundamentally wrong.  Although a defendant may waive an objection to the court's lack of personal jurisdiction, for example by making a general appearance (*In re Marriage of Obrecht* (2016) 245 Cal.App.4th 1, 8 ["[b]y generally appearing, a defendant relinquishes all objections based on lack of personal jurisdiction or defective process or service of process"]; see *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee* (1982) 456 U.S. 694, 703-704 [a party may, intentionally or unintentionally, waive an objection to the lack of personal jurisdiction by contract, appearance in court or failure to raise the defense in an answer or responsive pleading]; *Rockefeller Technology Investments (Asia) VII v. Changzhou SinoType Technology Co., Ltd.* (2020) 9 Cal.5th 125, 139), a defendant's failure to appear does not forfeit an objection the court has no personal jurisdiction over it.  To the contrary, a trial court lacks jurisdiction in a fundamental sense when it lacks personal jurisdiction over a party.  (*Albelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 288.)  As such, any ensuing judgment is void and "'vulnerable to direct or collateral attack at any time.'"  (*People v. American Contractors Indemnity Co.* (2004) 33 Cal.4th 653, 660; accord, *Armstrong v. Armstrong* (1976) 15 Cal.3d 942, 950 ["[c]ollateral attack is proper to contest lack of personal or subject matter jurisdiction"]; *Strathvale Holdings v. E.B.H.* (2005) 126 Cal.App.4th 1241, 1249 [attack on judgment for lack of personal jurisdiction may be brought at any time]; see *Lee v. An* (2008) 168 Cal.App.4th 558, 564 [default judgment entered by court that lacked personal jurisdiction can be set aside as void].)

The second aspect of the Githakwa parties' argument—the propriety of the trial court reviewing sua sponte the issue of personal jurisdiction before entering a default judgment—has not been directly addressed by California courts, but federal courts have uniformly upheld the district court's authority to do so. (E.g., *Mwani v. Osama Bin Laden* (D.C. Cir. 2005) 417 F.3d 1, 6 ["a court should satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant"]; *System Pipe & Supply, Inc. v. M/V Viktor Kurnatovskiy* (5th Cir. 2001) 242 F.3d 322, 324 [district court did not err in assessing personal jurisdiction sua sponte prior to entering default judgment]; *Tuli v. Republic of Iraq (In re Tuli)* (9th Cir.1999) 172 F.3d 707, 712 [court may sua sponte dismiss an action for lack of personal jurisdiction before entering a default judgment]; *Dennis Garberg & Assocs. v. Pack-Tech Internat. Corp.* (10th Cir. 1997) 115 F.3d 767, 772 ["district court must determine whether it has jurisdiction over the defendant before entering judgment by default against a party who has not appeared"].)[4] Determining whether personal jurisdiction exists, the federal courts reason,

---

[4] The Githakwa parties' description of a split in federal authority on this question is illusory. The cases they cite illustrate only that sua sponte review is treated differently in different circumstances. Where a party has appeared, raised a defense and abandoned it, sua sponte review of personal jurisdiction before entering a default judgment is permissible, but not mandatory. (*City of New York v. Mickalis Pawn Shop, LLC* (2011) 645 F.3d 114, 135; *e360 Insight v. Spamhaus Project* (2007) 500 F.3d 594, 599-600.) In contrast, when a defendant has failed to appear, the federal circuit courts have unanimously held an affirmative duty exists to determine personal jurisdiction before entering a default judgment.

safeguards against entry of a void judgment. (See, e.g., *System Pipe & Supply, Inc.,* at p. 324; *Tuli*, at p. 712; *Williams v. Life Sav. & Loan* (10th Cir. 1986) 802 F.2d 1200, 1203.)

That compelling rationale applies equally in California's courts, and we adopt it as our own. The trial court did not err in this case by evaluating its personal jurisdiction over Al Shabaab before granting the Githakwa parties' request for entry of a default judgment.

### b. *The trial court provided the Githakwa parties adequate notice and an opportunity to address personal jurisdiction*

The constitutional guarantee of due process requires a trial court give a plaintiff notice and an opportunity to respond before dismissing an action on its own motion. (*In re Marriage of Straczynski* (2010) 189 Cal.App.4th 531, 538-539 (*Straczynski*); *Bricker v. Superior Court* (2005) 133 Cal.App.4th 634, 639; *Moore v. California Minerals Products Corp.* (1953) 115 Cal.App.2d 834, 835-837 (*Moore*).) Beyond that fundamental principle, however, "the precise dictates of due process are flexible and vary according to context." (*Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 212.) The right to be heard does not necessarily require the court give a party the opportunity for an oral presentation; due process may be satisfied when the party has been able to present a written argument that fully addresses the determinative issues. (See *Lewis v. Superior Court* (1999) 19 Cal.4th 1232, 1247 [oral hearing not required before court issues a peremptory writ in the first instance; "use of the terms 'heard' or 'hearing' does not require an opportunity for an oral presentation, unless the context or other language indicates a contrary intent"]; *Jane J. v. Superior Court* (2015)

10

237 Cal.App.4th 894, 909 [same]; see also *Morris B. Silver M.D., Inc. v. International Longshore & Warehouse etc.* (2016) 2 Cal.App.5th 793, 798 (*Morris*).)

Neither *Straczynski*, *supra*, 189 Cal.App.4th 531 nor *Moore, supra*, 115 Cal.App.2d 834, cited by the Githakwa parties, supports their contention the procedure used here by the trial court violated their due process rights. In *Straczynski* the court of appeal held the trial court violated due process when it dismissed a petition for dissolution of marriage for reasons introduced for the first time at the hearing. (*Straczynski*, at p. 538.) In *Moore* the trial court granted judgment on the pleadings sua sponte. The court of appeal reversed because the plaintiff had not been given the opportunity to defend his pleading or "a chance to request the privilege of amending." (*Moore*, at p. 836.)

Unlike in *Straczynski* and *Moore* the trial court gave the Githakwa parties specific notice that it questioned its jurisdiction over Al Shabaab and expressly invited them to address that issue: The court's June 14, 2017 dismissal order explained that the allegations in the original complaint were insufficient to establish personal jurisdiction over Al Shabaab and gave the Githakwa parties the opportunity to amend their complaint to include additional facts to cure that deficiency.

As this court indicated in *Morris*, *supra*, 2 Cal.App.5th 793, when a party has had the opportunity to brief a determinative legal issue, the court may decide that issue in a different procedural context and without an additional oral hearing without violating due process. (*Id.* at p. 798 [because plaintiff's responsive brief addressed the determinative legal issue in opposing a demurrer, trial court did not violate due process by

11

resolving the issue and dismissing the action sua sponte].) The Githakwa parties took full advantage of the trial court's invitation, thoroughly addressing the personal jurisdiction issue in their second amended complaint and subsequent application for a default judgment, which included supporting declarations and a memorandum of points and authorities. The procedures used satisfied due process.

In any event, the Githakwa parties fail to suggest what additional information concerning personal jurisdiction—factual or legal—they could have provided with additional notice, more briefing or an in-person hearing, or how a further hearing would have changed the outcome of the case. Absent any showing of prejudice, we cannot reverse the trial court's order. (See *Thornbrough v. Western Placer Unified School Dist.* (2013) 223 Cal.App.4th 169, 200 ["'procedural due process violations, even if proved, are subject to a harmless error analysis'"]; *Hinrichs v. County of Orange* (2004) 125 Cal.App.4th 921, 928 [same]; see generally *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 802 [for a trial court's order to be overturned, appellant must demonstrate an error was prejudicial; that except for the error, a different outcome was probable].)

    2. *The Trial Court Correctly Concluded It Lacked Personal Jurisdiction over Al Shabaab*

      a. *Governing law and standard of review*

California courts may exercise personal jurisdiction "on any basis not inconsistent with the Constitution of this state or of the United States." (Code Civ. Proc., § 410.10.) The exercise of jurisdiction over a nonresident defendant comports with these Constitutions if the defendant has such minimum contacts with California that the assertion of jurisdiction does not violate

12

traditional notions of fair play and substantial justice. (*Snowney v. Harrah's Entertainment, Inc.* (2005) 35 Cal.4th 1054, 1061; *Pavlovich v. Superior Court* (2002) 29 Cal.4th 262, 268; *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 446 (*Vons*).)

Under the minimum contacts test personal jurisdiction may be either general or specific. (*Bristol-Myers Squibb Co. v. Superior Court* (2017) 582 U.S. ___ [137 S.Ct. 1773, 1779-1780] (*Bristol-Myers*); *Snowney v. Harrah's Entertainment, Inc., supra*, 35 Cal.4th at p. 1062.) General jurisdiction exists when the defendant's contacts with the forum state are so "substantial" or "continuous and systematic" as to make it consistent with traditional notions of fair play and substantial justice to subject the defendant to the jurisdiction of the forum even when the cause of action is unrelated to the defendant's contacts with the forum. (*Vons, supra*, 14 Cal.4th at p. 446; *Daimler AG v. Bauman* (2014) 571 U.S. 117, 127.)

Specific jurisdiction, on the other hand, requires some nexus between the cause of action and the defendant's activities in the forum state. Under well-established case law specific jurisdiction exists when (1) the defendant has "purposefully availed" himself or herself of forum benefits; (2) the controversy is related to or arises out of the defendant's contacts with the forum; and (3) the assertion of personal jurisdiction would comport with "'fair play and substantial justice.'" (*Pavlovich v. Superior Court, supra*, 29 Cal.4th at p. 269; accord, *Vons, supra*, 14 Cal.4th at p. 446; *Daimler AG v. Bauman, supra*, 571 U.S. at pp. 126-127; *Burger King Corp. v. Rudzewicz* (1985) 471 U.S. 462, 472-473.) There are no bright line rules for determining jurisdiction. "'[R]ather, the facts of each case must be weighed to

determine whether the requisite "affiliating circumstances" are present.'" (*Pavlovich*, at p. 268.)

The plaintiff bears the burden of showing the defendant has sufficient minimum contacts with the state to justify jurisdiction. (*Vons*, *supra*, 14 Cal.4th at p. 449.) When the evidence of jurisdictional facts is in conflict, we resolve that conflict in favor of the trial court's order, so long as it is supported by substantial evidence. (*Ibid*.) If that evidence is not disputed, the question of jurisdiction is one of law; and we independently review the trial court's decision. (*Ibid*.) Finally, we accept all well-pleaded allegations as fact. (*Steven M. Garber & Associates v. Eskandarian* (2007) 150 Cal.App.4th 813, 823 [a defendant's failure to answer before a default judgment is considered an admission of well-pleaded allegations in the complaint].)

> b. *Al Shabaab is not subject to the court's general jurisdiction*

General jurisdiction over a corporation exists when that corporation might be "fairly regarded as at home" in that state. (*Bristol-Myers, supra,* 137 S.Ct. at p. 1780; *Goodyear Dunlop Tires Operations*, *S.A. v. Brown* (2011) 564 U.S. 915, 924 (*Goodyear*).) As the Githakwa parties note, a terrorist organization is not a "corporation" in the traditional sense, but rather a "loosely organized, amorphous entity." However, as the Second Circuit observed, "[T]here is no reason to invent a different test for general personal jurisdiction depending on whether the defendant is an individual, a corporation, or another entity." (*Waldman v. PLO* (2d Cir. 2016) 835 F.3d 317, 332 [unincorporated associations Palestinian Authority (PA) and Palestine Liberation Organization (PLO) are entities subject to at-home test for general jurisdiction].)

Traditionally, a corporation is "at home" in its place of incorporation and its principal place of business. (*Daimler AG v. Bauman*, *supra*, 571 U.S. at p. 137.) But in an exceptional case a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in that state. (*Id.* at p. 139, fn. 19.) To test that possibility, courts look to a variety of factors, including maintenance of offices, the presence of employees, use of bank accounts and marketing or selling products in the forum state, to analyze whether a corporation's contacts render it effectively at home in that state. (See *F. Hoffman-La Roche, Ltd. v. Superior Court* (2005) 130 Cal.App.4th 782, 796; see also *Waldman v. PLO*, *supra*, 835 F.3d 317 at p. 334.)

The contacts between Al Shabaab and California described by the Githakwa parties—six California residents allegedly affiliated with the organization, attempts to radicalize others in the state, receipt of material support from Californians and direct threats and encouragement of terrorist attacks here—fall far short of demonstrating Al Shabaab may fairly be regarded as at home in this state.

In *Halyard Health, Inc. v. Kimberly-Clark Corp.* (2019) 43 Cal.App.5th 1062, 1065 a Delaware corporation with a principal place of business in Texas had 350 of its 42,000 employees working in California. That presence was held insufficient to warrant the exercise of general jurisdiction over the company. (*Id.* at p. 1070.) In comparison, Al Shabaab is reported to have thousands of fighters throughout the world with only a handful of individuals alleged to be working with or for Al Shabaab here.

Similarly, in *Waldman v. PLO, supra*, 835 F.3d 317 the court explained the PLO had two diplomatic offices in the United States, employed more than a dozen individuals over a period of two years, engaged in diplomatic activities and "'had a substantial commercial presence in the United States.'" (*Id.* at p. 323.) Its mission to the United States in Washington D.C. "used dozens of telephone numbers, purchased office supplies, paid for certain living expenses for . . . the chief PLO and PA representative in the United States, and engaged in other transactions." (*Ibid.*) Despite these ongoing connections to the United States, the court determined the evidence demonstrated the PA and PLO "are 'at home' in *Palestine*, where these entities are headquartered, and from where they are directed." (*Id.* at p. 334.)

Like the PLO, Al Shabaab is headquartered outside the United States and is "at home" far beyond our borders. Indeed, the organization's contacts with California are far less substantial than the PLO's contacts with the United States found insufficient by the Second Circuit in *Waldman*. Al Shabaab maintains no offices in California. The six California residents affiliated with Al Shabaab are fewer in number and more remotely connected with the organization than the 14 individuals employed at the PLO's mission in Washington D.C. In sum, the limited and sporadic connections the Githakwa parties allege Al Shabaab shares with California do not constitute the "continuous and systematic" activities necessary to justify the exercise of general jurisdiction over a party. (See *Vons*, *supra*, 14 Cal.4th at p. 445.)

16

### c. *The court lacked specific jurisdiction over Al Shabaab for the Garissa University attack*

In their second amended complaint, and for the purposes of this appeal, the Githakwa parties contend only that the trial court may exercise general personal jurisdiction over Al Shabaab. In not asserting the court has specific jurisdiction over Al Shabaab for the Garissa University attack, the Githakwa parties appear to recognize, when no relationship exists between the defendant's contacts with the forum state and the specific claims at issue, the court may not exercise specific jurisdiction "regardless of the extent of the defendant's unconnected activities in the State." (*Bristol-Meyer*, *supra,* 137 S.Ct. at p. 1781; accord, *Jayone Foods, Inc. v. Aekyung Industrial Co. Ltd.* (2019) 31 Cal.App.5th 543, 558 [same]; see *Gilmore Bank v. AsiaTrust New Zealand Ltd.* (2014) 223 Cal.App.4th 1558, 1568 [for the court to exercise specific jurisdiction, the controversy must relate to, or arise out of, the defendant's contacts with California].)

In *Waldman v. PLO, supra*, 835 F.3d 317 the PLO and PA's purposeful availment of forum benefits through offices, employees and a commercial presence in the United States did not establish specific jurisdiction here because that activity was unconnected to the "suit-related conduct"—terrorist attacks in Jerusalem. (*Id.* at p. 341.) While some of the victims were American citizens, that additional fact did not change the analysis. (*Id.* at p. 337.) Here, the Githakwa parties allege no connection between the Garissa University attack and the California individuals they have implicated as Al Shabaab affiliates. They do not suggest any donations originating in California were used to fund the attack. None of victims is alleged to be a California, or even United States, citizen. No matter how heinous the attack, "the

17

defendants cannot be made to answer in this forum 'with respect to matters unrelated to the forum connections.'" (*Id.* at p. 341, quoting *Goodyear Dunlap Tires Operations, S.A. v. Brown, supra*, 564 U.S. at p. 923.)

In sum, the Githakwa parties did not allege contacts between Al Shabaab and California sufficient to warrant the exercise of general or specific personal jurisdiction over the defendant. The court did not err in dismissing the case for a lack of personal jurisdiction.

## DISPOSITION

The judgment is affirmed. The Githakwa parties are to bear their own costs on appeal.


                                          PERLUSS, P. J.
We concur:



        FEUER, J.


        DILLON, J.*

---

*       Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

18